Michael Antonio PATTERSON,
Plaintiff–Appellant,

v.

COUNTY OF ONEIDA, NEW YORK; Oneida County Sheriff's Department; Daniel Middaugh, in his individual and official capacity as Sheriff; Peter Paravati, in his individual and official capacity as Undersheriff; William Chapple, in his individual and official capacity as Chief; Deputy William Balsamino in his official and individual capacity, Deputy Richard Phillips in his individual and Official Capacity; Lieutenant Rende, in his individual and Official Capacity; and John Does in their individual and official capacity as Employees and Representatives of the County of Oneida, Defendants–Appellees.

Docket No. 03–7535.

United States Court of Appeals, Second Circuit.

Argued: Feb. 18, 2004.
Decided: July 15, 2004.

---

A.J. Bosman, Utica, New York, for Plaintiff–Appellant.

Bartle J. Gorman, Utica, New York (Gorman, Waszkiewicz, Gorman & Schmitt, Utica, New York, on the brief), for Defendants–Appellees.

Before: KEARSE, CABRANES, and KATZMANN, Circuit Judges.

KEARSE, Circuit Judge.

Plaintiff Michael Antonio Patterson, a former employee of defendant Oneida County ("County") Sheriff's Department ("Sheriff's Department" or "Department"), appeals from a judgment and an order of the United States District Court for the Northern District of New York, David N. Hurd, *Judge*, dismissing, and adhering to the dismissal of, his complaint alleging, *inter alia*, that defendants violated his rights under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Equal Protection Clause of the Fourteenth Amendment, and state law, by subjecting him to a racially hostile work environment and terminating his employment on account of his race. The district court granted summary judgment dismissing Patterson's federal claims, ruling principally (a) that his Title VII claims were time-barred because he had not asserted them in an administrative complaint within 180 days of the occurrence of the alleged unlawful employment practices, and (b) that Patterson had failed to proffer evidence sufficient to permit an inference that he had been subjected to discrimination on the basis of his race. On appeal, Patterson contends that none of his claims are time-barred and that he proffered sufficient evidence to show that there were genuine issues of fact to be tried as to whether he was subjected to a racially hostile work environment and was fired because of his race, and whether there existed a Department custom, policy, or practice of racial discrimination. At the oral argument of this appeal, defendants expressly abandoned all arguments that Patterson's Title VII claims were barred by the 180–day limitations period, but they contend that the decision of the district court was otherwise correct. For the reasons that follow, we affirm the judgment except to the extent that it dismissed Patterson's hostile work environment claims against two of the individual defendants.

## I. BACKGROUND

Patterson, an African–American, was hired by the Sheriff's Department as a corrections officer on February 23, 1998; he was to serve a one-year probationary term, during which his performance and conduct were to be evaluated. He was dismissed on February 9, 1999, two weeks before the end of the probationary period. Patterson filed an administrative complaint with the Equal Employment Opportunity Commission ("EEOC") on December 2, 1999. After receiving a right-to-sue letter, he commenced the present action principally under Title VII and §§ 1981 and 1983, contending, *inter alia*, that the Department had a custom and practice of terminating the employment of African–Americans before the end of their probationary periods, that he had been fired because of his race, and that during his tenure at the Department he had been subjected to constant racial harassment by other corrections officers. Although claims under other provisions were originally asserted, they have not been pursued on this appeal and need not be described here.

The municipal defendants are the County and the Sheriff's Department. The individual defendants include Daniel Middaugh, County Sheriff; William Chapple, Chief Deputy of the Sheriff's Department; Undersheriff Peter Paravati, who was in charge of Department personnel matters; Joseph Rende, who at pertinent times was a lieutenant in the Department; Richard DePhillips (styled "Richard Phillips" in the caption), who was one of Patterson's supervisors; and William Balsamico (styled "William Balsamino" in the caption), a corrections officer employed at the County jail.

### A. *Patterson's Claims*

In support of his claims in the district court, Patterson described defendants' alleged harassment in various sworn statements, including his verified complaint, his affidavit, and his deposition testimony. His charges included the following.

In July 1998, Patterson was assigned to "B Block" of the Oneida County Correctional Facility (the "Jail"). That Block was commonly referred to by defendants and other Department personnel as "the 'Nigger Block.'" (Verified Complaint ¶ 18.) During that assignment, Patterson heard corrections officers yell "nigger" and make other racially disparaging statements; Patterson heard more than one voice making such comments, but he was not able to see or identify the speakers because the comments came from behind locked doors.

Between October 1998 and mid-January 1999, while working in a different building of the Jail, Patterson on a dozen occasions heard racially offensive statements made over an intercom system, originating from a room to which only Department employees had access. Those comments included "Whites before blacks," "nigger in the house," "bald headed black man," and "Whites before blacks, you know the rules." (Verified Complaint ¶ 19.) Patterson was never able to identify the speakers because the door to the room was locked, and although there was a window it was tinted.

Patterson did not report the above comments to any superior officer when they were made. (*See* Deposition of Michael Antonio Patterson ("Patterson Dep.") at 23.) Nor did he report them to Chapple when Chapple interviewed him after his employment had been terminated. (*See id.* at 24.)

Patterson also alleged that while on duty on January 1, 1999, at approximately 1 or 2 a.m., he was attempting to go through a

certain door but was redirected to a different door, and that upon passing through the door to which he had been rerouted, he was "jumped and assaulted" by Balsamico, DePhillips, and a third deputy he could not identify. (Verified Complaint ¶ 20.) His assailants proceeded to, *inter alia,* spray him with mace (*see id.*), temporarily blinding him (*see* Patterson Dep. at 54), and punched him in the ribs (*see id.* at 56). They also covered him with shaving cream (*see* Verified Complaint ¶ 20), making a number of racially offensive comments, including one by Balsamico: "Now you're a white man with an Afro" (Patterson Dep. at 39–40, 55). Patterson attempted to escape from his attackers, but "the master control booth operator had secured the sliding door," and Patterson was eventually "covered with shaving cream over his head, face, hands, feet and uniform." (Verified Complaint ¶ 21.) After this incident, Patterson rinsed his eyes and returned to his duties. (*See* Patterson Dep. at 56.) Although his eyes burned for "quite a while" thereafter, he did not seek medical treatment. (*Id.*) He did not report the incident to any superior officer; nor did he report it in his posttermination interview with Chapple. (*See id.* at 40.)

Patterson testified that, other than the above white-man-with-an-Afro statement, he did not recall any racially offensive statements by Balsamico. He alleged, however, that "[i]t was the long established custom, routine, and practice of the officers of the Oneida County Sheriff's Department to refer to African American inmates as 'niggers' 'moolies' 'jungle bunnies' and 'natives' both in the presence and outside the presence of Black officers." (Verified Complaint ¶ 32.) Patterson did not recall any racially offensive statements by Middaugh, Chapple, Paravati, or Rende. (*See* Patterson Dep. at 36–37, 65–66, 68.) Rende, however, one of Patterson's supervisors who saluted White officers in Patterson's presence, habitually refused to speak to Patterson and refused to return his salutes. (*See* Verified Complaint ¶ 28.) And DePhillips, Patterson's immediate supervisor, made racially offensive statements to him virtually every day, such as "What's up, my black man?". (Patterson Dep. at 67.)

Patterson also asserted that the Sheriff had an Emergency Rescue Team ("SERT"), a quasi-military all-White group for which Black officers were not eligible. (*See* Verified Complaint ¶ 30.) SERT had a "custom, routine, and practice" of "us[ing] Nazi-like gestures, tactics, and drills" and engaged in intimidating behavior that was "notoriously racist and representative of racial hatred, producing a racially hostile environment." (*Id.* ¶ 31.)

Patterson also alleged that he was denied opportunities afforded to other corrections officers to train and receive certification in the use of appropriate weapons. (*See* Verified Complaint ¶ 33–34, 46.) Although Patterson received positive employee evaluations, including a January 29, 1999 evaluation stating that his performance met all Department requirements and that he had exhibited a positive attitude, he was dismissed on February 9, 1999.

### B. *Defendants' Motion for Summary Judgment*

Defendants other than DePhillips, who was never served with process, disputed Patterson's allegations of racial harassment and racial motivation in the termination of his employment and, after a period for discovery, moved for summary judgment dismissing the complaint. Each individual defendant who had been served submitted an affidavit denying that the discriminatory and/or harassing conduct attributed to him by Patterson had in fact occurred. As a matter of law, defendants

contended that all of Patterson's Title VII claims were time-barred because they were governed by the 180–day limitations period that is applicable when a claimant has not filed his claims with a state or local agency, *see generally* 42 U.S.C. § 2000e–5(e)(1)—a contention defendants have now abandoned—and that even if the 300–day limitations period applied, *see id.*, the only discriminatory conduct alleged by Patterson to have occurred during that period was the termination of his employment. Defendants maintained that Patterson had been dismissed not for any invidious reason but because the Department had learned of several instances in which his conduct had been incompatible with the interests of law enforcement. In support of that rationale, defendants submitted, *inter alia*, an affidavit from Chapple, whose responsibilities as chief deputy included making evaluations as to whether probationary corrections officers had satisfactorily completed their probationary periods and making recommendations as to whether they should be continued in permanent status (*see* Affidavit of William Chapple dated August 26, 2002 ("Chapple First Aff."), ¶ 3).

Chapple stated that "[r]ace played no part in Mr. Patterson's termination nor is there a hostile work environment at the Oneida County Jail. Mr. Patterson was discharged based on a number of factors indicating that his conduct was unsatisfactory for his continued employment in a permanent position." (Chapple First Aff. ¶ 20.) Chapple stated that in early February 1999 he had recommended that Patterson's probationary employment be terminated immediately. (*See id.* ¶ 4.) His affidavit and a February 4, 1999 memorandum he had sent to Paravati, attached to the affidavit as Exhibit "B" ("Chapple February 4 Memorandum"), stated, *inter alia*, (1) that Patterson had been accused of assaulting an inmate housed at the Jail;

(2) that on February 1, 1999, the police in Rome, New York, had been summoned to deal with a matter of domestic violence involving Patterson and a female; (3) that Mark Ammann, a member of the Oneida County Drug Enforcement Task Force ("Drug Task Force"), had informed Chapple "that Patterson frequents known crack houses and has purchased dope[ and that a] known crack dealer identified [Patterson] as her boyfriend"; (4) that Ammann's wife, who was a part-time correction officer, had recently been questioned by Patterson about Ammann's work, including questions that would permit his identification, such as the location of his undercover work and his current appearance; and (5) that Patterson had compromised the safety of another Drug Task Force undercover officer, Arthur Broccoli, by disclosing Broccoli's identity to the target of an investigation. (Chapple First Aff. ¶ 20 & Chapple February 4 Memorandum, attached thereto as Exhibit B.)

As to item (3) above, Chapple attached to his affidavit a memorandum from the Drug Task Force, authored by Ammann and headed "Subject: Dep. Michael Patterson," which stated as follows:

It has come to our attention that the above named subject is currently employed by the Oneida County Sheriff's Department and is assigned to the Correctional Facility. Patterson has come to our attention on numerous occasions while conducting narcotic investigations within Oneida County. We have received information from confidential informants that have proven themselves reliable within the Oneida County Court System, that Patterson has bought and uses cocaine. These actions could prove to be a security risk for the facility and a liability for the Sheriff's Department and Oneida County.

(Memorandum from Mark Ammann to William Chapple dated January 4, 1999, attached to Chapple First Aff. as part of Exhibit C.)

As to the details of item (5) above, defendants submitted an affidavit from Broccoli, who stated that at the pertinent times he was a Department investigator working undercover. (*See* Affidavit of Arthur Broccoli dated August 22, 2002 ("Broccoli Aff."), ¶¶ 1–2.) As such, he was present at the Jail occasionally, but not frequently. (*See id.* ¶ 1.) Broccoli stated that on July 2, 1998, while posing as a drug buyer in a bar, he had encountered an African–American male who looked familiar but whose name he did not then know, (*see id.* ¶ 2), but who he eventually learned was Patterson (*see id.* ¶ 6). On July 2, Broccoli successfully bought drugs from a target of his investigation; but the next time he attempted to make a purchase from the same target, the target said he had been informed that Broccoli worked for the Sheriff. (*See id.* ¶¶ 2, 3.) Broccoli thereafter learned from "a reliable confidential informant" that the target had been informed of Broccoli's identity—and had been advised not to sell to Broccoli again—by "a black County Corrections Officer named Mike from Rome [who had been] in the bar that day." (*Id.* ¶ 4.) Broccoli reported these events to his supervisor and was eventually shown a photographic array that included a picture of Patterson. (*See id.* ¶¶ 5, 6.) From the array, Broccoli identified Patterson as the man he had encountered in the bar on July 2, 1998. (*See id.* ¶ 6.)

Sheriff Middaugh submitted an affidavit stating that he had approved Chapple's recommendation for Patterson's dismissal, citing principally "Exhibit B to the affidavit of Chief Chapple" (Affidavit of Daniel G. Middaugh dated August 26, 2002 ("Middaugh Aff."), ¶ 2), *i.e.*, the Chapple February 4 Memorandum detailing the information received as to the several instances of misconduct of which Patterson had been accused.

Defendants contended that they were entitled to summary judgment dismissing Patterson's federal claims principally (1) because Patterson had proffered no evidence from which it could be inferred that he was fired because of his race, especially in light of defendants' evidence showing nondiscriminatory reasons for his firing, and (2) because the conduct alleged by Patterson was insufficiently offensive to create a hostile work environment. As to the latter contention, defendants argued that the racial slurs were not sufficiently frequent and that the mace incident was no more than inappropriate horseplay. In addition, the individual defendants moved for dismissal of Patterson's Title VII claims against them on the ground that individuals are not subject to liability under Title VII. Defendants also argued that all claims against DePhillips should be dismissed because he had never been served with process.

In opposition to defendants' summary judgment motion, Patterson submitted an affidavit stating, *inter alia,* that he had not used drugs during his employment with the Department and denying that he had "ever interfered with or even had any knowledge of any undercover drug operation." (Affidavit of Michael A. Patterson dated October 4, 2002 ("Patterson Aff."), ¶ 7.) He stated that he had answered the charge that he had assaulted an inmate (*see id.* ¶ 2), attaching a copy of his response which stated as follows: "I know nothing about the alleged incident that this inmate says occurred. I cannot give information about an incident that I don't remember as happening" (Memorandum from Michael Patterson to Joseph Rende dated February 3, 1999). Patterson also

reiterated assertions he had made in his prior sworn statements, such as his verified complaint and his deposition, as to the harassment he had suffered and the common use of racial references or epithets by corrections officers at the Jail. (*See* Patterson Aff. ¶¶ 9–10, 12.)

In addition, Patterson submitted affidavits from two other former Department employees, Mary Kalk and Antione Hawkins, describing the use of racially offensive language at the Department. Kalk, employed by the Department from approximately July 1994 to July 2001 as secretary to the undersheriff, stated that she had once heard Paravati, in reference to a Black officer, shouting that "he 'Had Coon Problems'"; that Paravati "referred to Black Corrections Officers as 'THOSE' people"; and that he once "was amused and chuckled" when a corrections officer "used the term 'Nigger.'" (Affidavit of Mary Kalk dated October 4, 2002 ("Kalk Aff."), at ¶¶ 3–6.) Hawkins, a probationary employee of the Sheriff's Department beginning in January 2000, stated, *inter alia*, that "It is a custom, practice and policy" of the Department (Affidavit of Antione [*sic*] Hawkins dated October 4, 2002 ("Hawkins Aff."), ¶¶ 5, 7; *see id.* ¶ 6) "to intimidate and ridicule Black officers because of their race" (*id.* ¶ 7), to deny "Black officers . . . opportunities afforded to white officers" (*id.* ¶ 6), and "to terminate Black officers before the completion of their probationary period based upon false or trumped up allegations or charges not . . . used against white officers for similar treatment" (*id.* ¶ 5). Hawkins stated that he had been "subjected to intimidation and ridicule because of [his] race" (*id.* ¶ 4), and that racially derogatory comments against Blacks and Puerto Ricans were a common part of officers' conversations (*see id.* ¶ 8). On one occasion in October or November 2001, an inmate told Hawkins of a statement by another officer that "'Hawkins won't be here for long, he's with the brothers.'" (*Id.*) Hawkins stated that he had reported "this conduct through the chain of command and nothing was done about this." (*Id.*) Hawkins also stated that he, unlike White probationary officers, had been denied appropriate training. (*See id.* ¶ 4.)

Patterson also proffered two affidavits that were part of the record in *Brown v. Middaugh,* 96–CV–1097 (N.D.N.Y.) ("*Brown–v–Middaugh*"), a civil rights action by James Brown, a Black former deputy in the Department, along with excerpts from deposition and hearing testimony given in that case. One affidavit was that of Brown in support of an injunction against a suspension to which he had been subjected after being in a five-car accident and being charged with driving while intoxicated (*see* Affidavit of James Brown in *Brown–v–Middaugh,* dated June 10, 1998 ("Brown Aff."), ¶¶ 2–4). Brown stated that six other deputies, whom he listed by name, had told him they had been charged with DWI but were never subjected to Department discipline as a result. (*See id.* ¶ 12.) The other affidavit was, apparently, that of a Department deputy whose name and identifying personal history had been redacted (the "Anonymous affidavit"). The Anonymous affidavit stated that the Department "discriminates against Black deputies in assignments, training, and discipline" (Anonymous affidavit dated June 10, 1998, ¶ 5); that "a white deputy," whom the affiant did not identify, "charged with driving while intoxicated . . . was never subjected to suspension" (*id.* ¶ 4); and that "[o]n information and belief there are numerous other instances where other white sheriff's deputies were charged with driving while intoxicated who were never suspended or disciplined in any fashion" (*id.*).

Patterson argued that he had introduced sufficient evidence to enable a reasonable factfinder to find that he had been subjected to both disparate treatment and a hostile work environment on the basis of his race, and that the Sheriff's Department had a policy and practice of allowing racial discrimination against its employees and had failed to train its employees to stop or prevent such discrimination. He also argued that the timing of his termination, which occurred shortly before the end of his probationary period, itself permitted an inference that his race played a role in the decision.

In reply to Patterson's submissions, defendants submitted, *inter alia,* an affidavit by Chapple listing several African-Americans who, between 1997 and 2002, had successfully completed the Department's probationary period and been elevated to permanent status. (*See* Supplemental Affidavit of William Chapple dated October 11, 2002 ("Chapple Supp. Aff."), ¶ 2.) He also attached a list of employees who had not successfully completed the probationary period, which included individuals of both genders and all races. (*See id.* ¶ 3 & Exhibit B thereto.) Chapple also denied the assertions in the Hawkins affidavit, and he described the reasons for the Department's termination of its employment of Hawkins as a corrections officer, stating that Hawkins had, *inter alia,* been caught on camera using an inmate to make his supervisory tour. (*See* Chapple Supp. Aff. ¶ 4.)

## C. *The Decision of the District Court*

In a Memorandum-Decision and Order dated October 30, 2002, the district court granted defendants' motion in its entirety. *See* 2002 WL 31677033 (N.D.N.Y. Oct.30, 2002). In addition to finding that Patterson's Title VII claims were untimely, the court concluded that Patterson had failed to adduce any facts sufficient to show that his termination was racially motivated. It found that the alleged incidents of racial harassment provided no indication that race played any part in Patterson's dismissal because Patterson had not reported any of those incidents to anyone in a supervisory position:

> Patterson failed to report the specific incidents of racial slurs and the mace-shaving cream assault by fellow officers to someone in a supervisory position, such as Chapple, Lieutenant Rende, Paravati, and Middaugh. Because these incidents went unreported they do not demonstrate any intent by the defendants to discriminate against Patterson.
>
> ....
>
> Plaintiff states that all Blacks are terminated during their probationary period. Plaintiff further discredits defendants' submissions tending to show that both whites and Blacks are terminated during probation. However, plaintiff fails to set forth any facts establishing that Blacks are, in fact, treated differently than whites as far as termination during probation.

2002 WL 31677033, at *3.

The court also noted, *inter alia,* that the evidence showed that all officers who had received some of the weapons training that Patterson claims was denied him "were more senior than plaintiff (in most cases significantly more senior)," and that Patterson's "allegations that there is unequal treatment in termination during probation[ and] in the opportunity to take [various types of] training" were "conclusory." *Id.* The court concluded that summary judgment should be granted in favor of the moving defendants because Patterson failed to adduce facts sufficient to support his claims of unequal treatment by the Department on the basis of his race.

The court dismissed Patterson's claims against DePhillips for lack of personal jurisdiction because DePhillips had never been served with the complaint. *See id.* at *4. Finally, having dismissed all of Patterson's federal claims, the district court declined to exercise supplemental jurisdiction over Patterson's state-law claims, and dismissed them without prejudice. *See id.*

Patterson moved for reconsideration, arguing principally that his claims were not time-barred. He also proffered the disciplinary file of another African–American corrections officer named "Mike" who had had a substance abuse problem in 1999, and he argued that defendants had used information from the disciplinary file of the other Mike in order to justify their dismissal of Patterson. In a Decision and Order dated April 16, 2003 ("Reconsideration Decision"), the district court denied the motion.

As to the timeliness contention, the court noted, *inter alia*, that even if the 180–day limitations period were inapplicable, "the only alleged act of discrimination that would fall within the 300 days of the time plaintiff filed his charge is his termination." Reconsideration Decision at 3. The court concluded that, in light of the information defendants had received as to Patterson's conduct, *see id.* at 3–4, Patterson had presented "no evidence, direct or circumstantial, from which a fair-minded trier of fact could reasonably conclude that plaintiff was terminated under circumstances giving rise to an inference of discrimination," *id.* at 3. The court stated that

> [e]ven looking at the evidence in the light most favorable to plaintiff, there is no evidence that the reasons offered by defendants are false or, more importantly, that defendants had, or should have had, reason to believe that they were false.... Even going so far as to assume for purposes of this motion that

plaintiff was not a drug user, he did not reveal the identity of an undercover law enforcement officer, and he did not assault an inmate, there still is no evidence from which a jury could reasonably conclude that plaintiff was fired on account of discriminatory animus.

*Id.* at 4–5.

As to Patterson's "other-Mike" theory, the court stated that Patterson had produced

> no evidence supporting [his] contention that defendants used the other disciplinary file against him. Rather, his contention in this regard consists solely of surmise and conjecture, which is insufficient to overcome defendants' motion for summary judgment.

*Id.* at 5–6.

This appeal from the judgment dismissing the complaint and from the denial of reconsideration followed.

## II. DISCUSSION

As indicated above, at the oral argument in this appeal defendants expressly abandoned their prior contention that Patterson's Title VII claims are barred by the 180–limitations period, conceding that the 300–day period is applicable but endorsing the district court's view that even the 300–day period bars all of his Title VII claims except the claim for unlawful termination. Patterson argues principally (a) that all of his Title VII claims were timely asserted because his termination and the earlier racial harassment were part of a continuous policy and practice of discrimination; (b) that even if his claims of hostile work environment under Title VII are time-barred, he should be allowed to pursue his claims under §§ 1981 and 1983, which are subject to a three-year statute of limitations; and (c) that he presented sufficient evidence of racial discrimination both in

the termination of his employment and in the maintenance of a hostile work environment to show genuine issues to be tried, thereby making summary judgment inappropriate. For the reasons that follow, we find merit only in the argument that summary judgment was inappropriate with respect to Patterson's § 1981 and § 1983 claims against Balsamico and Rende for hostile work environment.

*A. The Pertinent Summary Judgment Principles*

The pertinent principles governing consideration of a motion for summary judgment are well established. The motion may not be granted unless the court determines, *inter alia,* that there is no genuine issue of material fact to be tried. *See* Fed.R.Civ.P. 56(c). In making that determination, the court is to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Stern v. Trustees of Columbia University,* 131 F.3d 305, 312 (2d Cir. 1997). The same standards apply to this Court's review of a decision granting summary judgment. *See, e.g., Richardson v. New York State Department of Correctional Service,* 180 F.3d 426, 436 (2d Cir.1999).

 Affidavits submitted in support of or in opposition to the summary judgment motion must "be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e); *see, e.g., Sarno v. Douglas Elliman–Gibbons & Ives, Inc.,* 183 F.3d 155, 160 (2d Cir.1999); *H. Sand & Co. v. Airtemp Corp.,* 934 F.2d 450, 454 (2d Cir.1991); 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2738, at 328 (3d ed.1998). The Rule's requirement that affidavits be made on personal knowledge is not satisfied by assertions made "on information and belief." *See, e.g., Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988). However, a verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, and not merely on information and belief, has the effect of an affidavit and may be relied on to oppose summary judgment. *See, e.g., Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001), *cert. denied,* 536 U.S. 922, 122 S.Ct. 2586, 153 L.Ed.2d 776 (2002). Rule 56(e)'s requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavit also means that an affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial. *See, e.g., Sarno v. Douglas Elliman–Gibbons & Ives, Inc.,* 183 F.3d at 160. Nor is a genuine issue created merely by the presentation of assertions that are conclusory. *See, e.g., Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2738, at 346–56 (3d ed.1998). Rule 56(e) states that "[w]hen a motion for summary judgment is made and supported as provided in this rule, ... the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth *specific facts* showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(e) (emphasis added).

Testimony of a nonparty witness that was given at a prior hearing is, when

offered for its truth, hearsay. *See generally* Fed.R.Evid. 801(c). It is not admissible at a subsequent trial under the exception for "former testimony" unless the declarant is unavailable and the party against whom it is offered at the subsequent trial "had an opportunity and similar motive" at the prior hearing "to develop the testimony by direct, cross, or redirect examination." Fed.R.Evid. 804(b)(1).

### B. *The Title VII Claims*

For a number of reasons, we conclude that summary judgment dismissing all of Patterson's Title VII claims was appropriate.

#### 1. *Timeliness*

A plaintiff may bring a claim under Title VII only for acts of discrimination that occurred within the statutory period set by 42 U.S.C. § 2000e–5(e)(1). All parties are now agreed that the pertinent period in this case is the 300–day period that ended on December 2, 1999, when Patterson filed his EEOC complaint.

"Under the continuing violation exception to the Title VII limitations period, if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Lambert v. Genesee Hospital*, 10 F.3d 46, 53 (2d Cir.1993), *cert. denied*, 511 U.S. 1052, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994). To bring a claim within the continuing violation exception, a plaintiff must at the very least allege that one act of discrimination in furtherance of the ongoing policy occurred within the limitations period. *See generally Cornwell v. Robinson*, 23 F.3d 694, 703–04 (2d Cir. 1994). A claim of hostile work environ-

ment is timely so long as one act contributing to the claim occurred within the statutory period; if it did, "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (*"Morgan"*).

However, § 2000e–5(e)(1) "precludes recovery for *discrete* acts of discrimination or retaliation that occur outside the statutory time period," even if other acts of discrimination occurred within the statutory time period. *Morgan*, 536 U.S. at 105, 122 S.Ct. 2061 (emphasis added). Thus, the mere fact that an employee was dismissed within the statutory period cannot be used "to pull in [a] time-barred discriminatory act," *id.* at 113, 122 S.Ct. 2061, for " 'continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination,' " *id.* at 112–13, 122 S.Ct. 2061 (quoting *Delaware State College v. Ricks*, 449 U.S. 250, 257, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980)).

In the present case, the 300–day limitations period, which ended on December 2, 1999, began on February 5, 1999. None of the allegedly harassing acts of which Patterson complained occurred later than January 1999. Thus, the only allegedly discriminatory act of which Patterson complained that occurred within the 300–day period was the termination of his employment on February 9, 1999. Patterson proffered no evidence to show that the termination, even if discriminatory, was in furtherance of the alleged practice of racial harassment. Accordingly, the district court properly dismissed all of Patterson's Title VII claims of hostile work environment as untimely.

**2.** *The Termination Claims Against the Individual Defendants*

■ Before reaching the substance of Patterson's Title VII claim for unlawful termination, we note that "individuals are not subject to liability under Title VII." *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir.2000) (per curiam); *see, e.g., Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir. 1995) ("individual defendants with supervisory control over a plaintiff may not be held personally liable under Title VII"), *abrogated on other grounds by Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Accordingly, the district court properly dismissed Patterson's Title VII claims against the individual defendants.

**3.** *The Termination Claims Against the Municipal Defendants*

■ In order to make out a prima facie case of racial discrimination in the termination of employment in violation of Title VII, a plaintiff is required to adduce some evidence that would permit a factfinder to infer, *inter alia*, that the termination occurred under circumstances giving rise to an inference of discrimination. *See generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Norville v. Staten Island University Hospital*, 196 F.3d 89, 95 (2d Cir.1999). Once the plaintiff satisfies his initial, "minimal," burden, *see, e.g., St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("*Hicks*"); *Windham v. Time Warner, Inc.*, 275 F.3d 179, 187 (2d Cir.2001), "the burden of production shifts to the employer 'to articulate some legitimate, nondiscriminatory reason for the'" termination, *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996) (quoting *McDonnell Douglas*, 411 U.S. at 802, 93

S.Ct. 1817), supported by admissible evidence "which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action," *Hicks*, 509 U.S. at 507, 113 S.Ct. 2742 (emphasis omitted). If the employer carries this burden, the burden shifts back to the plaintiff to demonstrate by competent evidence that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Windham v. Time Warner, Inc.*, 275 F.3d at 187. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff," *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089, and if the plaintiff has failed to show that there is evidence that would permit a rational factfinder to infer that the employer's proffered rationale is pretext, summary judgment dismissing the claim is appropriate, *see, e.g., Smith v. American Express Co.*, 853 F.2d 151, 154–55 (2d Cir.1988) (affirming summary judgment in light of plaintiff's failure to present more than conclusory and substantially unsupported assertions that employer's proffered race-neutral rationale for denial of promotion was pretext).

■ In the present case, Patterson sought to support his assertion that the termination of his employment was part of a racially discriminatory policy principally by submitting the affidavit of Hawkins, which stated that the Department had a "custom, practice and policy ... to terminate Black officers before the completion of their probationary period based upon false or trumped up allegations or charges not ... used against white officers for similar treatment" (Hawkins Aff. ¶ 5). Insofar as it purports to relate to the termi-

nation of Patterson, however, the Hawkins affidavit was deficient in at least two respects. First, there is no evidence that Hawkins had any connection with the Department until nearly a year after Patterson's employment was terminated. His affidavit did not show any personal knowledge with respect to the motivation for or the circumstances surrounding the termination of Patterson. Second, Hawkins's statement that the Department had such a custom, practice and policy is entirely conclusory. Such conclusory allegations, which appear in other submissions by Patterson as well, are insufficient to support the proposition advanced or to show the existence of a genuine issue to be tried.

Patterson also contends that he has made a sufficient showing of racial motivation in his termination by presenting evidence of a past pattern of racially hostile conduct. However, his attempt to show such a pattern through third-party evidence of past conditions at the Jail was inadequate for a variety of reasons. For example, we see no relevance in Patterson's evidence that in a seven-year period Kalk once heard Paravati use a racial epithet and once heard him laugh when a corrections officer did so (*see* Kalk Aff. ¶¶ 4, 6). Such isolated events over an extended period of time have little intrinsic probative value. Further, Patterson produced no evidence that the decision to terminate his employment was either made or initiated by Paravati. According to aspects of defendants' affidavits that were in no way challenged, the recommendation for Patterson's firing was made by Chapple (*see* Chapple First Aff. ¶ 4), and the ultimate decision was made by Middaugh principally on the basis of Chapple's February 4 Memorandum (*see* Middaugh Aff. ¶ 2).

Patterson proffered no evidence of any bias on the part of Middaugh. Nor did he point to sufficient evidence to show bias toward him on the part of Chapple. Neither Patterson himself nor any of the third-party witnesses whose sworn statements he submitted stated that Chapple had ever used racially offensive language. Rather, Patterson proffered excerpts from the hearing testimony of former Department corrections officer Kevin Kulesa in *Brown–v–Middaugh* for the proposition that "Chapple has exhibited a tolerance for racist behavior" (Patterson brief on appeal at 10). This proffer suffered two flaws. First, the Kulesa testimony proffered by Patterson was not competent evidence in opposition to summary judgment in the present case because, as proffered, it was hearsay and was neither reaffirmed in an affidavit by Kulesa stating, for example, that he would give the same testimony at a trial of Patterson's claims, nor supported by any showing that that prior testimony would be admissible under Fed.R.Evid. 804(b)(1) if offered by Patterson at trial. Second, the Kulesa testimony has no probative value whatever on the matter of Patterson's termination. In the Chapple-related portion of the excerpt offered by Patterson, Kulesa's testimony was merely that on one occasion in 1994, Kulesa handed Chapple a report and told him that another officer had referred to a fellow officer as "a fucking nigger," and Chapple's only response was that Kulesa should leave the report on Chapple's desk. (*Brown–v–Middaugh* Hearing Transcript, July 23, 1998, at 192–93.) Even had that exchange been contemporaneous with Patterson's probationary period, rather than preceding it by several years, it would provide no evidence of racial animus on the part of Chapple in recommending that Patterson be dismissed. Indeed, the Kulesa testimony itself was given more than six months prior to Patterson's dismissal.

Nor was Patterson's opposition to summary judgment properly supported by his proffer of two affidavits that had been submitted in *Brown–v–Middaugh*. As with the Kulesa testimony, there was no submission of affidavits in the present case by those affiants repeating or adopting their prior statements, and Patterson made no showing that the *Brown–v–Middaugh* affidavits would be admissible here. Nor did the content of those affidavits— even if the affidavits themselves were not hearsay—comply with Rule 56(e). The Brown affidavit, for example, made the conclusory assertion that Brown was "personally aware of numerous instances in which White deputies were charged with similar or more egregious acts and were never suspended 'pending investigation', with or without pay, even after guilty pleas and disposition of their charges" (Brown Aff. ¶ 10); but no "specific facts" as required by Rule 56(e), were provided. The Brown affidavit also gave the names of six deputies, "5 of whom" were said to have "verified to [Brown]" that they had been charged with DWI' but not disciplined (Brown Aff. ¶ 12); but the assertion by Brown that other persons made such "verifi[cations]," was further hearsay. The other *Brown–v–Middaugh* affidavit submitted by Patterson was from the affiant whose name and identifying statements had been redacted. Except for the fact that this affidavit was submitted, we would have thought it unnecessary to point out, *inter alia*, that Rule 56(e)'s requirement that affidavits opposing summary judgment "set forth specific facts" is not satisfied by an affiant whose identity is not disclosed purporting to describe the treatment of another person whose identity also is not disclosed (*see, e.g.,* Anonymous affidavit dated June 10, 1998, ¶ 4).

In sum, Patterson produced no evidence that racial harassment at the hands of fellow officers had any bearing on the De-partment's decision to terminate his employment. We conclude that there plainly was a dearth of evidence to show that the termination of his employment occurred under circumstances giving rise to an inference of discrimination.

In contrast, the municipal defendants presented admissible evidence that Patterson's employment was terminated because the Department had received a plethora of information indicating that Patterson had engaged in a variety of specified conduct that was antithetical to the interests of law enforcement. Chapple's first affidavit and the attached Chapple February 4 Memorandum recounted information that Patterson had been accused of, *inter alia*, domestic violence, violence against an inmate, frequenting crack houses and buying drugs, closely questioning the wife of Drug Task Force officer Ammann as to the location of his undercover work and what appearance he had adopted, and disclosing the identity of the undercover officer Broccoli to a drug dealer.

Although Patterson appears to suggest that the Department did not know of some of these events until after the termination of his employment on February 9, 1999, he presented no evidence to support that supposition, and the dates on the documents principally supporting Patterson's dismissal squarely refute his suggestion. To be sure, some of the documentation confirming these accusations, such as the Rome Police Department's written report of the domestic violence incident and a memorandum by Broccoli memorializing his information about the interference of Patterson with his undercover work, were received by the Department after Patterson's termination. But it is clear that some of the documentation had been received earlier— for example, Patterson's own memorandum responding to the accusation of inmate abuse was dated February 3, 1999;

and the memorandum by Ammann to Chapple, stating that the Drug Task Force had received reliable information that Patterson had bought and used cocaine, was dated January 4, 1999. And there can be no doubt that the Department had received the information itself prior to Patterson's February 9 termination, because the information was expressly discussed in Chapple's memorandum dated February 4.

Further, although Patterson, in his response to defendants' motion for summary judgment, denied the substance of some of the accusations that were described in Chapple's February 4 Memorandum, stating in his affidavit, for example, that he had not used drugs while he was a Department employee and that he had not disclosed the identity of any undercover officer (*see* Patterson Aff. ¶ 7), he presented no evidence to suggest either that the accusations against him had not been made or that the Department had not received the information described in Chapple's February 4 Memorandum from presumably reliable sources, including the Rome Police Department, the Oneida County Drug Enforcement Task Force, and the undercover officers themselves.

Finally, we see no merit in Patterson's contention that he made an adequate showing of pretext by pointing to the disciplinary file of the "other Mike," which documented that individual's involvement with drugs, and arguing that the Department had used the other Mike's file to justify its suggestion that Patterson had engaged in the drug-related activities described in Chapple's February 4 Memorandum. As the district court noted, Patterson presented no evidence to support his contention that the Department used the "other Mike" file in connection with the firing of Patterson. Moreover, we note that the mere existence of another "Mike" who was a Black corrections officer cast no

doubt whatever on Broccoli's allegation that it was Patterson who had informed the drug dealer that Broccoli was an undercover officer. Broccoli was told by a reliable informant that the disclosure was made by "a black County Corrections Officer named Mike from Rome [who had been] in the bar that day." (Broccoli Aff. ¶ 4.) There is no indication in the record that the "other Mike" was from Rome (where Patterson lived); and Broccoli eventually identified the officer who had been "in the bar that day" (*id.* ¶ 4) as Patterson when he saw Patterson's picture in a photographic array (*see id.* ¶ 6).

Given this record, we conclude that the district court correctly ruled that Patterson had not proffered any evidence of facts relating to the termination of his employment that would permit a rational factfinder to infer that the termination was motivated by his race, especially in light of his failure to proffer any evidence of facts to refute the Department's evidence that it had received the above information as to the several accusations against Patterson by other law enforcement entities. Accordingly, the Title VII claims were properly dismissed.

C. *Patterson's Claims under § 1981 and § 1983*

Section 1981 provides, in pertinent part, that "[a]ll persons within the jurisdiction of the United States shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens ...." 42 U.S.C. § 1981(a). This section thus outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment, *see, e.g., Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 68–69 (2d Cir.2000), and is applicable to a plaintiff complaining of discrimination

during an employment period of probation, *see generally Grillo v. New York City Transit Authority,* 291 F.3d 231, 233–35 (2d Cir.2002) (per curiam).

Section 1983, to the extent pertinent here, allows an action at law against a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights." *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). It merely provides "a method for vindicating federal rights elsewhere conferred," *id.,* such as those conferred by § 1981. Indeed, "the express cause of action for damages created by § 1983 constitutes the *exclusive* federal remedy for violation of the rights guaranteed in § 1981 by state governmental units ...." *Jett v. Dallas Independent School District,* 491 U.S. 701, 733, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) (emphasis added). A § 1983 action may not, however, be brought to vindicate rights conferred only by a statute that contains its own structure for private enforcement, such as Title VII. *See, e.g., Saulpaugh v. Monroe Community Hospital,* 4 F.3d 134, 143 (2d Cir.1993) ("A plaintiff cannot use Section 1983 to gain perceived advantages not available to a Title VII claimant"). "A Title VII plaintiff is not precluded from bringing a concurrent § 1983 cause of action," such as a claim for denial of equal protection, "so long as the § 1983 claim is based on a distinct violation of a constitutional right," *Gierlinger v. New York State Police,* 15 F.3d 32, 34 (2d Cir.1994); *see, e.g., Saulpaugh v. Monroe Community Hospital,* 4 F.3d at 143.

Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981 or the Equal Protection Clause, *see, e.g., Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d at 69 (§ 1981); *Jemmott v. Coughlin,* 85 F.3d 61, 67 (2d Cir.1996) (§ 1983); *Sorlucco v. New York City Police Department,* 888 F.2d 4, 6–7 (2d Cir.1989) (same), and the factors justifying summary judgment dismissing Patterson's Title VII claim against the municipal defendants for termination of his employment equally support the summary dismissal of his claims for termination brought under 42 U.S.C. §§ 1981 and 1983. Likewise, as discussed below, most of the standards applicable to the conduct alleged to constitute hostile work environment in violation of Title VII are also applicable to Patterson's employment claims under § 1981 and his equal protection claims under § 1983. However, there are several significant differences.

### 1. *Differences Between Title VII and §§ 1981/1983*

First, claims under 42 U.S.C. §§ 1981 and 1983 need not be asserted within the 180– or 300–day period applicable to Title VII claims. The statute of limitations applicable to claims brought under §§ 1981 and 1983 in New York is three years. *See, e.g., Tadros v. Coleman,* 898 F.2d 10, 12 (2d Cir.) (per curiam), *cert. denied,* 498 U.S. 869, 111 S.Ct. 186, 112 L.Ed.2d 149 (1990) (§ 1981); *Wynder v. McMahon,* 360 F.3d 73, 76 (2d Cir.2004) (§ 1983). The events complained of here occurred in 1998 and 1999. Patterson having initiated the present action in 2000, his §§ 1981 and 1983 claims are not time-barred.

■ Second, when the defendant sued for discrimination under § 1981 or § 1983 is a municipality—or an individual sued in his official capacity, *see Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) (claim against a municipal employee in his official capacity is deemed brought against the municipality itself)—the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom, *see, e.g., Jett v. Dallas Independent School District,* 491 U.S. at 733–36, 109 S.Ct. 2702, (§ 1981); *Monell v. Department of Social Services,* 436 U.S. 658, 692–94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (§ 1983). To show a policy, custom, or practice, the plaintiff need not identify an express rule or regulation. *See, e.g., Sorlucco v. New York City Police Department,* 971 F.2d 864, 870 (2d Cir.1992). It is sufficient to show, for example, that a discriminatory practice of municipal officials was so "persistent or widespread" as to constitute "a custom or usage with the force of law," *id.* at 870–71 (internal quotation marks omitted), or that a discriminatory practice of subordinate employees was "so manifest as to imply the constructive acquiescence of senior policy-making officials," *id.* at 871; *see, e.g., Gierlinger v. New York State Police,* 15 F.3d at 34 ("Section 1983 liability can be imposed upon individual employers, or responsible supervisors, for failing properly to investigate and address allegations of sexual harassment when through this failure, the conduct becomes an accepted custom or practice of the employer."). A policy, custom, or practice may also be inferred where "the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction." *Kern v. City of Rochester,* 93 F.3d 38, 44 (2d Cir.1996), *cert. denied,* 520 U.S. 1155, 117 S.Ct. 1335, 137 L.Ed.2d 494 (1997) (internal quotation marks omitted). Lia-

bility of a municipal defendant or an individual sued in his official capacity under § 1981 and § 1983 cannot, however, be premised on a theory of *respondeat superior. See, e.g., Jett,* 491 U.S. at 733–36, 109 S.Ct. 2702 (§ 1981); *Monell,* 436 U.S. at 690–91, 98 S.Ct. 2018 (§ 1983).

■ Third, although as discussed in Part II.B.2. above, Title VII claims are not cognizable against individuals, individuals may be held liable under §§ 1981 and 1983 for certain types of discriminatory acts, including those giving rise to a hostile work environment, *see, e.g., Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d at 75 (§ 1981); *Hayut v. State University of New York,* 352 F.3d 733, 753–54 (2d Cir.2003) (§ 1983). Thus, Patterson's hostile work environment claims against the individual defendants, sued in their individual capacities under §§ 1981 and 1983, are not automatically dismissable.

[26] Fourth, although in certain circumstances a Title VII claim may be established through proof of a defendant's mere negligence, without a showing of discriminatory intent, *see, e.g., Richardson v. New York State Department of Correctional Service,* 180 F.3d at 441–42 (employer subject to liability if negligent in responding appropriately to a complaint of racial harassment by co-workers), a plaintiff pursuing a claimed violation of § 1981 or denial of equal protection under § 1983 must show that the discrimination was intentional, *see Tolbert v. Queens College,* 242 F.3d 58, 69 (2d Cir.2001) (§ 1981); *Back v. Hastings on Hudson Union Free School District,* 365 F.3d 107, 118 (2d Cir.2004) (§ 1983); *see generally Saint Francis College v. Al–Khazraji,* 481 U.S. 604, 613, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987) (§ 1981); *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S.

252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (§ 1983).

Under these principles, and given the substantive standards applicable to conduct that is alleged to have created a hostile work environment, discussed in the following section, we conclude that Patterson has raised genuine issues to be tried as to two of the individual defendants but not the others.

2. *Hostile or Abusive Work Environment*

■■■] To defeat a motion for summary judgment on a claim of racially hostile work environment, "a plaintiff must produce evidence that the workplace [wa]s permeated with discriminatory intimidation, ridicule, and insult, that [wa]s sufficiently severe or pervasive to alter the conditions of the victim's employment." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir.2000) (internal quotation marks omitted). Although isolated incidents ordinarily will not rise to the level of a hostile work environment, even a single incident of sufficient severity may so alter the terms and conditions of employment as to create such an environment. *See generally Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 136 (2d Cir.2001), *cert. denied*, 537 U.S. 824, 123 S.Ct. 110, 154 L.Ed.2d 34 (2002); *Richardson v. New York State Department of Correctional Service*, 180 F.3d at 437. The matter of whether the conduct alleged was so "severe or pervasive" as to create "an objectively hostile or abusive work environment," *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), is to be decided based on the totality of the circumstances, in light of such factors as the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," *id.* at 23, 114 S.Ct. 367. Where reasonable jurors could disagree as to whether alleged incidents of racial insensitivity or harassment would have adversely altered the working conditions of a reasonable employee, the issue of whether a hostile work environment existed may not properly be decided as a matter of law. *See, e.g., Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d at 71; *Richardson v. New York State Department of Correctional Service*, 180 F.3d at 439.

3. *The Municipal Defendants and the Individual Defendants in Their Official Capacities*

As to the County, the Department, and the individual defendants sued in their official capacities, we cannot see in the record admissible evidence from which a rational factfinder could find that racial harassment of Black corrections officers in the Department, or discrimination against African–Americans in employment decisions, was so widespread as to permit an inference that the Department had a policy or custom of such harassment. Although Patterson alleged that these practices were pervasive, that assertion is conclusory, and he failed to support it with evidence of specific facts. As discussed in Part II.B.3. above, the third-party evidence that Patterson submitted in support of this allegation was similarly conclusory or was inadmissible hearsay. As to the racial harassment, Patterson himself could identify only two persons—Balsamico and DePhillips—who made racially offensive comments to him, and he did not recall any such comment by Balsamico other than the white-man-with-an-Afro remark when Balsamico and others were covering Patterson with shaving cream.

The record is similarly bereft of evidence sufficient to support a conclusion that the existence of a Department policy or custom of tolerating racial harassment could permissibly be inferred on the basis of a failure to investigate. Although Patterson testified that he first heard racially offensive comments in July 1998, that he heard a dozen such comments over the intercom in October and November 1998, and that he was physically and verbally assaulted in January 1999, he testified that he did not report any of these incidents to any superior officer (*see, e.g.,* Patterson Dep. at 23, 40). Though Patterson sought to attribute his failure to report these incidents to a fear of retaliation (*see* Patterson Aff. ¶¶ 8–9), he plainly had an opportunity to protest to Chapple without any fear of retaliation when Chapple interviewed him after his employment had been terminated; he did not mention the incidents to Chapple (*see* Patterson Dep. at 23–24, 40). Given the unavailability of *respondeat superior* liability, Patterson's failure to report to a superior officer any of the incidents of which he now complains, and his failure to present any facts—as contrasted with conclusory assertions—that the Department or those in charge of the Department were aware of such incidents, Patterson failed to show a genuine issue to be tried as to the existence of a policy or custom based on the mere failure to conduct an investigation.

Finally, the evidence presented by Patterson permits no inference of the existence of a municipal policy or custom based on a theory that the Sheriff's Department failed to train its employees that they should not engage in acts of racial hostility. Patterson's allegation that the County and the Department did not train their employees not to engage in racial harassment (*see* Verified Complaint ¶ 66) is conclusory and unsupported by any proffer of facts. Further, Patterson's assertion is squarely contradicted by nonconclusory evidence submitted to the district court by Patterson himself, to wit, the *Brown–v–Middaugh* testimony of Kulesa, offered by Patterson for the proposition, *inter alia,* that Kulesa, a Department corrections officer for a three-and-a-half year period in 1993–1996, had observed other Department officers using racial epithets for Blacks. The transcript excerpts submitted by Patterson include testimony by Kulesa that the Department had given training that such conduct was forbidden:

Q. Now, when you came to work for Oneida County, you received some training, did you not?

A. Yeah.

Q. One of the items that you were aware of was that there would be no prejudice, no racial slurs, no discriminatory conduct, isn't that a fact? Wasn't that part of your training? Isn't that a fact, that you knew that that was not allowed?

A. I didn't receive my training for the first six months that I was there.

Q. After the six months?

A. I was trained for three days when I—

Q. *But you came to be aware that there would be no tolerance for racial discrimination or any other prejudicial conduct at the institution by employees, isn't that a fact?*

A. *We learned that there wasn't supposed to be.*

Q. Fine. And you found that conduct when you observed it, at least at the times you've said you observed it, offensive, did you not?

A. Yes.

Q. *And you knew—and you knew that what you observed if, in fact, you observed it was a violation of the stan-*

*dards of the department, isn't that a fact?*

A. *That would be fair to say, yes.*

(*Brown-v-Middaugh* Hearing Transcript, July 23, 1998, at 210 (emphases added).) Patterson, having proffered this third-party testimony to the district court, cannot complain of its use against him. *See generally* Fed.R.Evid. 801(d)(2)(B) ("a statement of which the party has manifested an adoption or belief in its truth" is not, when offered against that party, hearsay); 4 *Wigmore on Evidence* § 1075, at 150 (Chadbourn rev.1972) ("some depositions or testimonies may be so used as to become admissions" (emphasis omitted)); *id.* § 1073, at 129 ("written statements of a *third person* may be so dealt with *by the party* that his assent to the correctness of the statements may be inferred, and they would thus by adoption become his own statements" (emphasis in original)); *id.* at 138 ("The party's *use of a document* made by a third person will frequently amount to an approval of its statements as correct, and thus it may be received against him as an admission by adoption." (emphasis in original)).

### 4. *The Individual Defendants in Their Individual Capacities*

■ In order to make out a claim for individual liability under § 1981, "a plaintiff must demonstrate some affirmative link to causally connect the actor with the discriminatory action.... [P]ersonal liability under section 1981 must be predicated on the actor's personal involvement." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d at 75 (internal quotation marks omitted). Likewise, a plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity under § 1983. *See, e.g., Back v. Hastings on Hudson Union Free School District*, 365 F.3d at 122. Personal in-

volvement, within the meaning of this concept, includes not only direct participation in the alleged violation but also gross negligence in the supervision of subordinates who committed the wrongful acts and failure to take action upon receiving information that constitutional violations are occurring. *See, e.g., Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995).

As to Middaugh, Paravati, and Chapple, there is no evidence in the record indicating that they had any involvement in any of the harassing incidents of which Patterson complains. Patterson testified that he could not recall hearing any of those defendants make any racially offensive comments. (*See* Patterson Dep. at 36, 65–66.) Nor, as discussed above, did he inform any of them of the racial harassment to which he was allegedly subjected. There being no evidence of their personal involvement in, or even knowledge of, the alleged harassment of Patterson, summary judgment dismissing the § 1981 and 1983 claims against them was proper.

■ However, the evidence against the two remaining individual defendants who were served, Balsamico and Rende, was sufficient to withstand the motion for summary judgment. Although Rende was not alleged to have made any racially offensive comments (*see* Patterson Dep. 42–43), Patterson claims that Rende, a lieutenant who was in charge of SERT (which Patterson alleges engaged in intimidating behavior that was "notoriously racist" (Verified Complaint ¶ 31)), subjected him to constant humiliation by refusing to speak to him and by always saluting White officers in Patterson's presence and never returning a salute from Patterson (*see* Patterson Dep. 68–69). Rende denies these allegations; but whether the alleged conduct occurred and whether, in light of the totality of the circumstances, it was suffi-

ciently humiliating to alter the conditions of Patterson's employment are questions to be answered by a factfinder.

■ Similar, though not identical, factual questions exist with respect to Patterson's claims against Balsamico for participating in the macing incident in January 1999. Patterson testified that he did not recall Balsamico's ever having made a racial remark prior to that time (*see* Patterson Dep. at 40–41), and Patterson has not cited any racially harassing conduct that occurred after that incident. Although a single incident ordinarily will not give rise to a cognizable claim for hostile work environment, this alleged event included not only racial remarks but also a physical assault in which Patterson was punched in the ribs and was temporarily blinded by having mace sprayed in his eyes. We cannot say that, as a matter of law, such an incident is not sufficiently severe, in all the circumstances, to create a hostile work environment. The matter of whether that incident occurred and whether it was of sufficient severity to alter the terms and conditions of Patterson's employment remain questions for a factfinder.

Finally, as to Patterson's claims under § 1983, for which a showing of state action is required, we note that there may be some question as to whether Rende and Balsamico, in engaging in the conduct attributed to them, may properly be considered state actors (or, if not, whether they may nonetheless be held liable under § 1983 by reason of having conspired with state actors to deprive Patterson of his federally protected rights, *see generally Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

To constitute state action, the deprivation must be caused by the exercise of some right or privilege created by the State ... or by a person for whom the State is responsible, and the party charged with the deprivation must be a person who may fairly be said to be a state actor.... [S]tate employment is generally sufficient to render the defendant a state actor.... It is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State.... Thus, generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law.

*West v. Atkins*, 487 U.S. 42, 49–50, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (internal quotation marks omitted). However, mere employment by the state does not mean that the employee's every act can properly be characterized as state action. *See, e.g., Pitchell v. Callan*, 13 F.3d 545, 548 (2d Cir.1994) (" 'acts of officers in the ambit of their personal pursuits are plainly excluded' " (quoting *Screws v. United States*, 325 U.S. 91, 111, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945))). Other circuits confronted with a plaintiff's claims of harassment by his or her nonsupervisory co-workers have ruled that some harassment should be construed merely as personal-frolic hazing or horseplay and not as state action. *See, e.g., Martinez v. Colon*, 54 F.3d 980, 987 (1st Cir.1995) (co-worker's "singularly personal frolic" of hazing the plaintiff until co-worker's gun accidentally discharged, maiming the plaintiff, held not state action), *cert. denied*, 516 U.S. 987, 116 S.Ct. 515, 133 L.Ed.2d 423 (1995); *Hughes v. Halifax County School Board*, 855 F.2d 183, 184, 186–87 (4th Cir.1988) (co-workers' taunts and a mock hanging of the plaintiff held not state action), *cert. denied*, 488 U.S. 1042, 109 S.Ct. 867, 102 L.Ed.2d 991 (1989); *Ottman v. City of Independence*, 341 F.3d 751, 761–62 (8th Cir.2003) (alleged sexual harassment by nonsupervisory co-worker held not state action).

On the present appeal, although defendants argue that the macing incident was mere horseplay and that the challenged conduct was not sufficiently severe to create a hostile work environment, the parties have not briefed the question of whether the challenged conduct of any of the individual defendants could be construed as state action. Accordingly, we leave this question for further consideration on remand.

## CONCLUSION

We have considered all of Patterson's contentions on this appeal and, except to the extent indicated above, have found them to be without merit. We note that the district court, after dismissing all of Patterson's federal claims, declined to exercise supplemental jurisdiction over his state-law claims and dismissed those claims without prejudice. Because we have concluded that Patterson's § 1981 and § 1983 hostile work environment claims against Balsamico and Rende should not have been summarily dismissed on the present record, we also vacate the dismissal of Patterson's state-law claims against those two defendants.

The judgment of the district court is affirmed except to the extent that it dismissed the hostile work environment claims under § 1981 and § 1983 against Balsamico and Rende in their individual capacities and the claims asserted against those two defendants under state law. As to these claims against Balsamico and Rende, the judgment of dismissal is vacated, and the matter is remanded for further proceedings not inconsistent with this opinion.

Each party shall bear his or its own costs of this appeal.