Rosemarie BIELSKI, Plaintiff,

v.

Michael GREEN, Monroe County District Attorney, The County of Monroe, Defendants.

No. 06–CV–6230L.

United States District Court, W.D. New York.

Dec. 11, 2009.

Nira T. Kermisch, Rochester, NY, for Plaintiff.

Sean T. Hanna, James L. Gelormini, Office of the New York State Attorney General, Rochester, NY, for Defendants.

## *DECISION AND ORDER*

DAVID G. LARIMER, District Judge.

This action was brought by a former employee of the Monroe County (New York) District Attorney's Office ("DA's office"), Rosemarie Bielski ("Bielski"), against Monroe County ("County") and District Attorney Michael Green, alleging claims under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the New York State Human Rights Law ("HRL"), N.Y. Exec. L. § 290 *et seq.* Plaintiff alleges that defendants failed to accommodate her physical limitations while she was employed as a stenographer for the DA's office, and that defendants discriminated against her on the basis of her sex. Both sides have moved for summary judgment.

### FACTUAL BACKGROUND

Bielski began working for the DA's office as a grand jury stenographer, or reporter, in 1977. In 1995, she was involved in an automobile accident, but was not

seriously injured, and was able to return to work full time.

The following year, however, plaintiff was in another car accident, and this time she required back surgery as a result. Plaintiff went back to work in January 1997, but asked that she not be scheduled to work any afternoons because she tended to suffer from back spasms in the afternoon. Her then-supervisor Ellen Amarosa accommodated that request, and assigned Bielski to work mornings only.

In 2002, Amarosa retired, and David DiRaimo took her place as plaintiff's supervisor. In the fall of that year, DiRaimo began scheduling plaintiff to work afternoons on some days, and mornings on other days.[1] Plaintiff alleges that "as a result [of these afternoon sessions, her] back condition was aggravated and [she] started suffering a great deal of pain." Bielski Aff. (Dkt. 20–2) ¶ 21.

Plaintiff states that she again asked not to be required to work afternoon sessions, and that in support of that request she submitted a letter from her doctor, Waseem Ghazoly, stating in part, "It is my advice that Mrs. Bielski's court sessions be scheduled during the morning hours, so she can avoid the prolonged sitting conditions in the ... court room in the afternoon. With prolonged sitting, the patient experiences increased pain and muscle spasm." Id. Ex. B. Plaintiff alleges that this request was not honored, however, and that she continued to be scheduled for afternoon grand jury sessions.

Defendant Green became the Monroe County DA in January 2004. The following month, Assistant District Attorney Bruce Goldman began supervising the stenographers.

In a memorandum to Goldman dated February 26, 2004, Green stated, "Based upon a review of the medical reports submitted by her doctor, we have determined that Rosemarie Bielski should no longer be scheduled for afternoon Grand Jury sessions," save for "exceptional situations," which Green defined as "situation[s] that exist[ ] when due to Grand Jury coverage demands there is a lack of flexibility in scheduling taking into account the number, time and availability of all the stenos as a group." Green added, "Please be sure she gets regularly scheduled breaks during these times." Id. Ex. C.

Plaintiff states that she was assigned to work mornings only for a few weeks after this memo was issued, but that after Goldman became her supervisor, he began again scheduling her for afternoon sessions as well. In a memo to Green dated April 6, 2004, Goldman stated that some recent changes in the way in which felony cases were prosecuted had necessitated changes in the scheduling of court stenographers. He stated that he had attempted to balance Bielski's health needs against considerations of fairness for all the reporters, he had been "able to create a schedule which had Rosemarie Bielski in grand jury for ten (10) mornings and only two (2) afternoons." Id. Ex. D. He added that "[t]he two (2) afternoons were on Fridays where if she didn't feel well she would have the entire weekend to feel better." Id.

Goldman also stated, however, that Bielski was unhappy with this change, and that she had told him that "this wasn't going to fly." He stated that "[t]his continued to be a bone of contention for Rosemarie

---

1. It appears that on days when Bielski was never assigned to work in the morning and afternoon on the same day. Plaintiff states in her affidavit that a grand jury "session would be either or an afternoon session, but not both," and that reporters never worked both a morning and an afternoon session on the same day. Dkt. # 20–2 ¶¶ 17, 87.

Bielski," and that "[t]his situation needs to be addressed," with consideration given to Bielski's needs, the effect that accommodating her requests would have on her fellow stenographers, and the needs of the DA's office with respect to grand jury proceedings. *Id.*

On September 7, 2004, Green sent another memo to Goldman, stating that he was "modify[ing his] February 26, 2004 memorandum," and that his prior statement about scheduling Bielski only in "exceptional situations" was "rescinded effective immediately. This means that Rosemarie Bielski should be scheduled for grand jury testimony situations the same as the other full time stenographers irrespective of whether the grand jury session is in the morning or the afternoon." Dkt. # 15 Ex. Z. Green stated that this rescission of his prior directive was based on recent changes in grand jury proceedings, staffing concerns, and budgetary restrictions. *Id.* He added that "[t]his modification should not be considered a temporary change, but rather a change made for the foreseeable future." *Id.*

Bielski did begin working more afternoon sessions. Although she still was never assigned to work both a morning and afternoon session on the same day, she alleges that after she began to be assigned to afternoon sessions, her back problems got significantly worse. In October 2004, Bielski was placed on medical leave because of her complaints of back pain.

Bielski returned to work in January 2005. In accordance with the terms of a letter to her dated December 21, 2004 and signed by District Attorney Administrator Richard Christopher, Bielski was to work initially only on a "daily, part-time basis," and her duties were limited to fulfilling requests for transcripts of grand jury testimony that she had taken previously.

She was not assigned to take any grand jury testimony. Bielski was to be paid her regular salary for the hours that she worked, and half pay for the balance of her regular seven-hour work day. Dkt. # 20–2 Ex. E. Christopher also informed Bielski that once she had finished all of the requested transcripts, she would be "placed back on half-pay sick leave pending the results of [her] doctor's re-evaluation." *Id.*

Christopher added that Bielski would not be allowed to take grand jury testimony "until [she] could return to work on a full time basis without restriction." He stated that it was "the position of the District Attorney's Office that one of the essential functions of a full time Grand Jury Stenographer is to be available" whenever needed, and that all stenographers "must be available to take [grand jury] testimony during work both morning and afternoon sessions without restriction." *Id.*

Plaintiff alleges that she believed that she was "being setup to be terminated," and that she therefore went back to Dr. Ghazoly and "asked him to remove all restrictions and to allow [her] to return to work on a full time basis." *Id.* ¶ 71. Dr. Ghazoly gave Bielski a statement to that effect (which does not appear to be in the record before me), but plaintiff alleges that when she provided her supervisors with a copy of that statement, they insisted that she submit to a medical examination "by their own doctor" before she would be allowed to return to work. *Id.* ¶ 72.

Bielski was examined in mid-February by a nurse practitioner at the offices of Karl Auerbach, M.D., a physician with the Department of Occupational and Environmental Medicine at Strong Memorial Hospital in Rochester. In a letter to Bielski dated March 2, 2005, Marie Murray, a Senior Personnel Technician with the

Monroe County Department of Human Resources, stated that "[a]s a result of the medical examination conducted on February 17, 2005, the determination has been made that you are not medically qualified to perform the essential functions of your position without restrictions.... Therefore, you will continue on a leave of absence." *Id.* Ex. F. Murray added that Bielski's leave would last for one year, but that during that time, Bielski could "apply for a medical examination to determine whether [she was] able to perform [her] job," and that if she were determined to be able to perform her job without restrictions, she would be reinstated. *Id.*

Plaintiff did request such an examination, and on April 8, 2005, she was examined by Dr. Auerbach. In a letter to Murray dated April 14, 2005, Dr. Auerbach stated that he was of the opinion that "Ms. Bielski has a medical condition that requires that she not sit for more than an hour without the opportunity to stand and stretch for at least 5 minutes." Dkt. # 15 Ex. CC.

Dr. Auerbach also noted that Bielski had indicated to him that she believed that it was necessary for her not to work "back to back" grand jury sessions in which she was taking live grand jury testimony in the afternoon and again the following morning. Dr. Auerbach stated that although he agreed that Bielski should not work two note-taking sessions in the same day, he could not "medically support a need for avoiding note taking sessions separated by an overnight." He opined that "there may be employee relations type issues involved in the request for the limitation of no 'back to back' rather than medical issues." *Id.*

On May 4, 2005, Christopher wrote Bielski another letter, which stated that based upon Dr. Auerbach's opinion that plaintiff could work, if certain accommodations were made, the DA's office would "attempt to make these accommodations ...," and allow plaintiff to return to work full time beginning May 9, 2005. Dkt. # 20–2 Ex. I. Christopher outlined a "return to work plan," pursuant to which the DA's "Office agree[d] that [Bielski would] not on a regular basis be scheduled" to take grand jury testimony for both a morning and an afternoon session on the same day. He also stated that when Bielski was assigned to grand jury sessions, she would be allowed to take a break once every hour, except for those "rare situations where such a break would hinder an ADA's ability to properly present his or her case." *Id.* Christopher asked Bielski, if she agreed with that plan, to sign the letter and give it to Goldman when she reported for work on May 9. *Id.*

Plaintiff contends in this action that these proposed accommodations were merely "cosmetic," and that they were essentially the same conditions under which every other stenographer worked anyway. She states, however, that she "had no choice" but to accept Christopher's proposal, since as a practical matter she "had to work...." *Id.* ¶¶ 86–90.

On August 25, 2005, however, plaintiff took a full disability retirement, at the age of 48. She alleges she was constructively discharged, because she could not continue to work with what she contends were the illusory "accommodations" that had been made by defendants.

Plaintiff commenced this action on May 5, 2006. The complaint asserts five causes of action. The first and fourth causes of action assert claims under the ADA, based on defendants' alleged failure to accommodate plaintiff's limitations from Aug. 2002 to May 2005, and from June 2005 to August 25, 2005 respectively.[2] Plaintiff seeks

**2.** Since Bielski returned to work on May 9, 2005, and continued to work until her retire-

$150,000 in compensatory damages and $50,000 in punitive damages on the first ADA claim, and $995,000 compensatory and $50,000 punitive damages on the second.

The second and fifth causes of action are brought under Title VII, for the same respective time periods alleged in the two ADA claims.[3] The basis for the Title VII claims is plaintiff's allegation that defendants would not accommodate her request that she not be assigned to work afternoon shifts, but that male stenographers were allowed to take afternoons off for a variety of reasons. Plaintiff seeks the same amounts of damages on these claims as in her ADA claims.

The third cause of action asserts a claim under the HRL for both disability and sex discrimination under the HRL, based on the same allegations as her federal claims. Plaintiff seeks compensatory damages of $995,000 on this claim.

## DISCUSSION

### I. Sex Discrimination Claims

■ To establish a prima facie case of sex discrimination under Title VII, a plaintiff must demonstrate that: (1) she was within the protected class; (2) she was qualified for her position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of unlawful discrimination. *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir.2009). Sex discrimination claims brought pursuant to the HRL are analyzed under the same Title VII framework. *See Cruz v.*

*Coach Stores, Inc.*, 202 F.3d 560, 565 n. 1 (2d Cir.2000).

Once the plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse act. *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir.2004) (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996)). If the defendant carries that burden, "the burden shifts back to the plaintiff to demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Patterson*, 375 F.3d at 221 (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). However, "'[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id.* (quoting *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089).

■ At least for purposes of their motion for summary judgment, defendants concede that plaintiff has established the first three elements of her claim. In that respect, they agree that on this motion, that the failure to accommodate plaintiff's request that she not be required to work any afternoons may be considered an "adverse action" for purposes of plaintiff's Title VII claim.

Defendants do contest the fourth element, *i.e.*, the presence of circumstances suggesting that Bielski was discriminated against on the basis of her gender. The

---

ment in August, it is not clear why the second ADA claim runs from *June* to August 2005.

**3.** The fifth cause of action does not expressly set forth any dates, but at oral argument on the parties' motions, plaintiff's counsel stated,

and defense counsel agreed, that the fifth cause of action was intended to cover the same period as her second ADA claim, *i.e.*, June to August 2005.

only evidence relied upon by plaintiff in that regard is that on certain occasions, male stenographers were given afternoons off on days that she was scheduled to work afternoons. In particular, plaintiff states, and defendants admit, that another stenographer, David DiRaimo, was allowed to take some afternoons off to play golf. DiRaimo testified that he used vacation time to take off Wednesday afternoons between April and November, and that he took off every other Friday afternoon "when [he] could." Dkt. # 24–4 at 103, 145.

DiRaimo and Bielski were not similarly situated, however, nor does the evidence show that they were in fact treated differently. First, there is no evidence, and plaintiff does not appear to contend, that DiRaimo was never required to work *any* afternoons at all, which is the arrangement that Bielski had requested for herself. DiRaimo testified, and plaintiff does not appear to deny, that during her final period of employment at the DA's office, from May to August 2005, she and DiRaimo each worked fifteen afternoons. *See* Dkt. # 15 Ex. GG at 136.

Furthermore, when he did take afternoons off, DiRaimo used his vacation time to do so. There is no evidence that Bielski was not, or would not have been, allowed to use accrued vacation time to take afternoons off. She alleges, of course, that she should not have been required to use vacation time in order not to work during the afternoon, since she claims that she should have been given afternoons off in the first place, on account of her back problems. The point is, however, that DiRaimo's use of his vacation time to take some afternoons off is simply not comparable to Bielski's request that she be given *all* afternoons off, without being required to use any leave, to accommodate her claimed disability.

Plaintiff also relies on evidence that another male stenographer, Thomas Lauricella, who was employed part time, was allowed to work mornings only. The evidence shows, however, that Lauricella worked part-time, 24 hours per week, and that after Bielski complained that he was not required to work afternoons, Lauricella *was* assigned to work afternoons. Bielski herself admitted as much at her deposition. *See* Dkt. # 15 Ex. D at 67. Although plaintiff states that "Mr. Lauricella started to work afternoons only after [Bielski] requested an accommodation," Plaintiff's Reply Mem. (Dkt.# 26) at 9, I fail to see the significance of that. If anything, it shows that defendants responded to Bielski's request by spreading out the afternoon work load more evenly among all the stenographers.

Furthermore, plaintiff admits that in 2004, Lauricella worked twenty-nine afternoons, compared with Bielski's twelve. Admittedly, Bielski was on disability leave from October 2004 through the end of that year, but Goldman testified, and plaintiff does not appear to dispute, that Lauricella suffered a heart attack "several days" after plaintiff went on leave, and that "he was out for an extensive period of time" during that same period. Dkt. # 24 Ex. JJ at 121. In short, this evidence does not support plaintiff's contention that she was treated differently from Lauricella.

Even if plaintiff could make out a prima facie case of disparate treatment, however, she fails to present evidence from which a reasonable factfinder could conclude that any differences between the way that she was treated compared with DiRaimo and Lauricella had anything to do with gender. *See Griffin v. County School Bd. of Prince Edward County,* 377 U.S. 218, 231, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964) ("showing that different persons are treated differently is not enough, without more, to

show a denial of equal protection"); *McDowell v. Gates*, No. 906CV–1060, 2009 WL 3055270, at *10 (N.D.N.Y. Sept. 21, 2009) (fact that, following altercation between black inmate and white inmate, defendant correction officer filed misbehavior report against black inmate but not against white inmate, without more, failed to establish prima facie case of race discrimination). Defendants have explained the bases for the way in which stenographers were scheduled, and those proffered reasons are discussed more fully with respect to Bielski's ADA claim, but with respect to her claims of sex discrimination, suffice it to say that there is simply no evidence of discriminatory animus.

## II. Disability Discrimination Claims

Plaintiff's claim of disability discrimination under the ADA is subject to a similar burden-shifting analysis as that applied to her sex discrimination claims.[4] First, plaintiff must establish a prima facie case of discrimination by demonstrating that: (1) her employer is subject to the ADA; (2) plaintiff was a person with a disability within the meaning of the ADA; (3) the plaintiff was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodations; and (4) either that plaintiff suffered an adverse employment action because of her disability, *see Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 169 (2d Cir.2006), or that her employer refused to make a reasonable accommodation for her. *Rodal v.*

Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir.2004).

Once the plaintiff in an adverse-action case has made out a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. The burden then shifts back to the plaintiff to show supply evidence that the reasons proffered by the employer "were not its true reasons, but were a pretext for discrimination." *Grana v. Potter*, No. 06–CV–1173, 2009 WL 425913, at *6 (E.D.N.Y. Feb. 19, 2009) (quoting *Patterson*, 375 F.3d at 221) (additional internal quotes omitted).

In a failure-to-accommodate case, once the plaintiff has shown that an accommodation exists that would permit her to perform her job's essential functions, "the analysis shifts to the question whether the proposed accommodation is reasonable; on this question the burden of persuasion lies with the defendant." *Jackan v. New York State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir.), *cert. denied*, 531 U.S. 931, 121 S.Ct. 314, 148 L.Ed.2d 251 (2000). *See also Sclafani v. PC Richard & Son*, 668 F.Supp.2d 423, 441 (E.D.N.Y.2009) (once plaintiff has made out prima facie case, burden shifts to employer to "demonstrate that the ... proposed accommodation would have resulted in undue hardship") (quoting *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 332 (2d Cir.2000)).

In the case at bar, Bielski alleges an adverse employment action, in the form of her constructive discharge. *See*

---

4. Although "the definition of a disability under New York law is not coterminous with the ADA definition," *Giordano v. City of New York*, 274 F.3d 740, 754 (2d Cir.2001), defendants in the case at bar concede for purposes of their motion that plaintiff is a person with a disability under both statutes. Def. Mem. of Law (Dkt.# 14–39) at 8. In all other respects pertinent to this action, the standards under both statutes are the same. *See Parker v.*

*Columbia Pictures Indus.*, 204 F.3d 326, 332 n. 1 (2d Cir.2000) ("the analysis [of plaintiff's disability discrimination claim] under the [HRL] parallels that used in the ADA context for all issues relevant to this appeal"); *Sclafani v. PC Richard & Son*, 668 F.Supp.2d 423, 440 n. 10 (E.D.N.Y.2009) ("The legal standards, as relevant here, for discrimination claims under the ADA and the NYSHRL are essentially the same").

*E.E.O.C. v. Lafond,* No. 07–CV–00988, 2009 WL 803150, at *12 n. 9 (E.D.N.Y. Mar. 25, 2009) (constructive discharge can constitute adverse action); *Shapiro v. New York City Dep't of Educ.,* 561 F.Supp.2d 413, 424 (S.D.N.Y.2008) (same). She does not actually allege that defendants intentionally discriminated against her *because* of her disability, however. Rather, she alleges that defendants refused to make a reasonable accommodation that would have allowed her to keep working, with the result that her working conditions became so intolerable that she was forced to take disability retirement. *Cf. Ekstrand v. School Dist. of Somerset,* 583 F.3d 972, 977–78 (7th Cir.2009) (distinguishing between plaintiff's failure-to-accommodate claim and her constructive-discharge claim, and holding that plaintiff had presented sufficient evidence for jury to find that former employer failed to make reasonable accommodation for plaintiff, but that plaintiff had "not shown that the conditions of her employment even approached the intolerable levels normally required in constructive-discharge cases"), *with Talley v. Family Dollar Stores of Ohio, Inc.,* 542 F.3d 1099, 1108 (6th Cir.2008) (holding that, "[a]ssuming that Talley was denied a reasonable accommodation that forced her to work in excess of her medical restrictions, a reasonable jury could infer that the defendants knew that Talley's working conditions would become intolerable to a reasonable person suffering from her particular disability," with result that she was constructively discharged, but cautioning that "our holding today does not pave the way for an employee to assert a claim for constructive discharge every time an employer fails to accommodate her disability").

Defendants here concede, for purposes of their motion, the first three elements of plaintiff's claim. The dispute here centers on whether she has shown that defendants refused to make a reasonable accommodation for Bielski, and if so whether she was constructively discharged as a result.

To prevail on this claim, Bielski must demonstrate that there existed a reasonable accommodation that would have enabled her to keep working. As the Court of Appeals for the Second Circuit has explained, Bielski "bears the burdens of both production and persuasion as to the existence of some accommodation that would allow her to perform the essential functions of her employment.…" *McBride v. BIC Consumer Products Mfg. Co., Inc.,* 583 F.3d 92, 97 (2d Cir.2009). With regard to the *reasonableness* of a proposed accommodation, however, Bielski "bears only a light burden of production that is satisfied if the costs of the accommodation do not on their face obviously exceed the benefits. The burden of persuasion falls on the defendant employer." *Id.* at 97 n. 3 (citing *Jackan,* 205 F.3d at 566, and *Borkowski v. Valley Central Sch. Dist.,* 63 F.3d 131, 138 (2d Cir.1995)).

In the case at bar, plaintiff contends that she could, and should, have been allowed to work only in the morning, and never in the afternoon. Although I have some doubts about whether such an inflexible, no-exceptions rule would have been feasible, given the vagaries of grand jury proceedings and staffing concerns, I find that plaintiff has shown that such an accommodation existed, at least, and that she has met her "light burden of production" of showing that such an accommodation would have been reasonable.

In response, defendants contend that they tried to accommodate Bielski's mornings-only request as much as they could, but that, for a number of reasons, they could not completely avoid scheduling her to work in the afternoon. Defendants contend that the sheer number of grand jury

hearings, combined with circumstances beyond their control that caused the DA's office to be stretched thin where stenographers were concerned, made it entirely reasonable for them to require Bielski to work *some* afternoon sessions. Defendants also maintain that they did reasonably accommodate plaintiff's disability, consistent with the findings and recommendations of Dr. Auerbach. In addition, defendants contend that their compliance with Bielski's proposed accommodation would have constituted an undue hardship for the DA's office, given the needs of the office and their staffing limitations with respect to grand jury stenographers.

■ " '[T]he question of whether a proposed accommodation is reasonable is fact-specific' and must be evaluated on 'a case-by-case basis.' " *Kennedy v. Dresser Rand Co.*, 193 F.3d 120, 122 (2d Cir.1999) (quoting *Wernick v. Federal Reserve Bank*, 91 F.3d 379, 385 (2d Cir.1996)). Resolving that question requires "consider[ation], among other factors, [of] the effectiveness of the modification [of the plaintiff's working conditions] in light of the nature of the disability in question and the cost to the organization that would implement it." *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir.1995).

■ " 'Undue hardship' is an employer's affirmative defense, proof of which requires a detailed showing that the proposed accommodation would 'requir[e] significant difficulty or expense' in light of specific enumerated statutory factors." *Rodal*, 369 F.3d at 121–22 (quoting *Lovejoy–Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 221 (2d Cir.2001); *see* 42 U.S.C. § 12111(10)(A)-(B) (identifying relevant factors to include (1) the employer's type of operation, including its composition, structure, and the functions of its workforce; (2) the employer's overall financial resources; (3) the financial resources involved in the provision of the reasonable accommodation; and (4) the impact of such accommodation upon the employer's operation).

■ In addition, if the employer has proposed a reasonable accommodation, the employee cannot insist on some other particular accommodation, even if the employee's proposed accommodation is also reasonable. *See Hankins v. The Gap Inc.*, 84 F.3d 797, 800–01 (6th Cir.1996) ("[A]n employee cannot make his employer provide a specific accommodation if another reasonable accommodation is instead provided") (citing *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68–69, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986)). *See also Schmidt v. Methodist Hosp. of Indiana, Inc.*, 89 F.3d 342, 344–45 (7th Cir.1996) ("Reasonable accommodation does not require an employer to provide literally everything the disabled employee requests"); *Kemer v. Johnson*, 900 F.Supp. 677, 686 (S.D.N.Y. 1995) ("Once a reasonable accommodation has been made, a defendant has fulfilled its obligation to make an accommodation. Thus, Defendant was not required to make Plaintiff's suggested accommodation, even if reasonable, since a reasonable accommodation had already been made") (citations omitted). If the accommodation proposed by defendants was reasonable, then, defendants may not be held liable under the ADA, since plaintiff has no right to insist on her own preferred accommodation instead.

■ While the reasonableness of a given accommodation may in some cases turn on factual issues that are for a jury to decide, *see, e.g., Rodal*, 369 F.3d at 121, summary judgment for the employer is nevertheless appropriate if the evidence shows that the employer offered an accommodation that was "plainly reasonable." *Wernick v. Federal Reserve Bank of New York*, 91 F.3d

379, 385 (2d Cir.1996); *see, e.g., Guice–Mills v. Derwinski,* 967 F.2d 794, 798 (2d Cir.1992); *Krikelis v. Vassar College,* 581 F.Supp.2d 476, 487–88 (S.D.N.Y.2008). In short, if the evidence shows conclusively that the employer offered a reasonable accommodation, then the employer is entitled to summary judgment. *See Cormier v. City of Meriden,* 420 F.Supp.2d 11, 20 (D.Conn.2006) ("The employer providing the accommodation has the ultimate discretion to choose between effective accommodations and may choose the less expensive accommodation or the accommodation that is easier for it to provide") (quoting 29 C.F.R. § 1630.9 App. Note).

In the case at bar, even viewing the evidence in the light most favorable to plaintiff, I conclude that the evidence shows, as a matter of law, that defendants did provide Bielski with a reasonable accommodation, in the form of their May 2005 proposal—which Bielski initially accepted—under which she would generally not be scheduled to take grand jury testimony in both the morning and afternoon of the same day, and she would be given a break every hour, except for "rare situations where such a break would hinder an ADA's ability to properly present his or her case." That proposal was consistent with Dr. Auerbach's recommendations in his April 14, 2005 letter, in which he opined that Bielski could work as long as she did not have to "sit for more than an hour without the opportunity to stand and stretch for at least 5 minutes." Dr. Auerbach also observed that he could find no medical support for Bielski's request that she not work an afternoon and a morning session "separated by an overnight."

In addition, defendants' offered accommodation was not contrary to the stated opinions of Bielski's own physician, Dr. Ghazoly. Although he had recommended, in October 2003, that plaintiff "be sched-uled during the morning hours, so she can avoid the prolonged sitting conditions in the . . . court room in the afternoon," read in context, that advice appears to be based on the premise that plaintiff would have worked a morning session, regardless. Dr. Ghazoly stated that given his understanding of Bielski's condition and her job duties, "her back condition is more fatigued by midday," so that "afternoon sessions are a considerable burden." Dkt. # 20–4.

The clear import of that statement is that Dr. Ghazoly was operating under the premise that Bielski was required to work morning court sessions. His statement that Bielski's back would be "more fatigued by mid-day" only makes sense if one assumes that, by mid-day, Bielski had already been required to "sit for [a] prolonged period[ ] of time" that same morning. *Id.* In other words, there was nothing uniquely fatiguing about afternoon sessions themselves, except for when they occurred on the same day as a morning session.

It is also true that in March 2004, Dr. Ghazoly gave plaintiff a note stating that she "should not be working afternoons in Court because of chronic lower back problems." Dkt. # 20–13 Ex. P. He gave no explanation, reasoning or basis for that statement, however. *See Robinson v. Morgan Stanley & Co. Inc.,* 269 Fed.Appx. 603, 607 (7th Cir.2008) (opinions of ADA plaintiff's treating physician, which "were based entirely on her conversations with Robinson," were insufficient to defeat employer's motion for summary judgment); *Gonzalez v. El Dia, Inc.,* 304 F.3d 63, 74 (1st Cir.2002) (district court properly dismissed plaintiff's ADA claim, where "the testimony presented by the treating physician [wa]s highly conclusory," and "simply parroted the definition of the term 'substantially limits' contained in the EEOC regulations, which plainly would not enable

a rational trier of fact to undertake the case-by-case assessment demanded under the ADA").

Furthermore, by plaintiff's own admission, in 2005 Dr. Ghazoly, at Bielski's request, gave her another written statement to the effect that she was able "to return to work on a full time basis," with *no* restrictions. Dkt. # 20–2 ¶ 71. It was only after Bielski provided defendants with that statement that they insisted that she first be examined by Dr. Auerbach, who opined that plaintiff could work with *some* restrictions. At the time that defendants offered plaintiff their proposed accommodation in 2005, then, Dr. Auerbach's recommendations were more restrictive than Dr. Ghazoly's had been, and, as stated, defendants' proposal was consistent with Dr. Auerbach's suggestions.

Plaintiff, then, has failed to demonstrate the existence of any genuine issues of material fact with regard to whether defendants offered her a reasonable accommodation. Even viewing the evidence in the light most favorable to plaintiff, no reasonable finder of fact could conclude that the accommodation provided by defendants was anything other than reasonable. That it may not have been to Bielski's liking is not enough to show that defendants violated the ADA. *See Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1108 (6th Cir.2008) ("an employee cannot force her employer to provide a specific accommodation if the employer offers another reasonable accommodation. If an employee rejects a reasonable accommodation,

the individual is no longer considered a 'qualified individual with a disability'") (quoting *Hedrick v. W. Reserve Care Sys. & Forum Health*, 355 F.3d 444, 457 (6th Cir.), *cert. denied*, 543 U.S. 817, 125 S.Ct. 68, 160 L.Ed.2d 25 (2004)).

■ As stated, an employee does not necessarily have the right to insist upon her preferred accommodation. The issue is whether the employer has fulfilled its duty to provide a reasonable accommodation that, if accepted, would allow the employee to perform her job. Based on the undisputed facts before me, I conclude as a matter of law that defendants did just that—provide a reasonable accommodation consistent with its needs, plaintiff's physical limitations, and the medical evidence and opinions of the physicians who treated and examined plaintiff. *See Wells v. Shalala*, 228 F.3d 1137, 1145 (10th Cir.2000) (finding that employer "made every effort to reasonably accommodate Plaintiff's disability," and that plaintiff's "steadfast[ ] refus[al to accept] any accommodation short of being relieved from his [work-related] travel obligations" was not reasonable); *Schmidt*, 89 F.3d at 344–45 (finding that the "accommodations [offered by the employer] may not have provided Schmidt everything that he wanted, but they are enough to satisfy Methodist's statutory duty").[5]

## III. Notice of Claim Requirement under HRL

■ Defendants move to dismiss plaintiff's HRL claim on the ground that plain-

---

**5.** Plaintiff's ADA claims against Green are also subject to dismissal on the ground that individuals cannot be held liable for damages under the ADA. *See, e.g., Albra v. Advan, Inc.*, 490 F.3d 826, 830 (11th Cir.2007); *Fasano v. Federal Reserve Bank of New York*, 457 F.3d 274, 289 (3d Cir.2006), *cert. denied*, 549 U.S. 1115, 127 S.Ct. 977, 166 L.Ed.2d 709 (2007); *EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1279–81 (7th Cir.1995); *Tamondong v.*

*GMAC Commercial Credit LLC*, No. 06 Civ. 770, 2006 WL 3377592, at *3 (S.D.N.Y. Nov. 17, 2006); *Falso v. Ablest Staffing Services*, No. 05–CV–6547, 2006 WL 692480, at *1 (W.D.N.Y. Mar. 14, 2006). *Cf. Harris v. Mills*, 22 A.D. 379, 572 F.3d 66, 72 (2d Cir.2009) (ADA plaintiff may seek prospective injunctive relief against an individual defendant in his official capacity).

tiff has failed to comply with the notice of claim requirement of N.Y. County Law § 52. Although my decision on the merits of plaintiff's claims renders it unnecessary for the Court to reach this issue, I note that defendants are entitled to dismissal of the HRL claim on this ground as well.

■■■ County Law § 52 statute makes applicable, to actions against a county, §§ 50–e and 50–i of the General Municipal Law, which require that a plaintiffs asserting tort claims against a municipal entity (1) file a notice of claim within ninety days after the claim arises, and (2) commence the action within one year and ninety days after the happening of the event upon which the claim is based. *Kubicek v. Westchester County*, No. 08–CV–372, 2009 WL 3720155, at *13 (S.D.N.Y. Oct. 8, 2009). Compliance with these provisions is a condition precedent to filing a tort claim against a municipal defendant. *Rist v. Town of Cortlandt*, 56 A.D.3d 451, 452, 866 N.Y.S.2d 762 (2d Dep't 2008).

In her initial response to defendants' motion, plaintiff argued that no notice of claim is required for an action under the HRL, because HRL claims are not considered to be "tort" claims for purposes of these provisions. As plaintiff recognizes in her reply memorandum, however, this is a distinction without a difference in an action against a county, because

> [t]he notice of claim statute at issue here, County Law § 52, applies to any claim for "invasion of personal or property rights, of every name and nature" and to any claim for damages "arising at law or in equity." Accordingly, a cause of action under the Human Rights Law, while not a traditional tort, is subject to the notice of claim requirements of County Law § 52.

*Picciano v. Nassau County Civil Service Comm'n*, 290 A.D.2d 164, 171, 736 N.Y.S.2d 55 (2d Dep't 2001). *See also*

*Grasso v. Schenectady County Pub. Library*, 30 A.D.3d 814, 816, 817 N.Y.S.2d 186 (3d Dep't 2006) ("pursuant to the County Law, the General Municipal Law notice of claim requirements apply to plaintiff's tort and discrimination claims"); *Anderson v. Nassau County Dep't of Corrections*, 558 F.Supp.2d 283, 303 (E.D.N.Y. 2008) (noting that "County Law § 52(1) has broader application than General Municipal Law § 50–e," and concluding that "the notice of claim requirements apply to the plaintiff's claims against Nassau County and the individual defendants acting in their official capacities").

■■■ Plaintiff also contends that defendants should be estopped from moving to dismiss on this ground because they did not raise plaintiff's failure to comply with County Law § 52 in their answer. In response, defendants contend that they were not obligated to raise this issue in their answer, but they also request leave to amend their answer to do so.

New York courts have held that "[t]he notice of claim requirement is a condition precedent to the commencement of a tort action against defendant[s to whom it applies] and not a Statute of Limitations that must be pleaded as an affirmative defense." *Hey v. Town of Napoli*, 265 A.D.2d 803, 804, 695 N.Y.S.2d 643 (4th Dep't 1999). *See also Zhao v. City of New York*, 656 F.Supp.2d 375, 401 (S.D.N.Y. 2009) ("defendants were under no obligation at the outset to advise plaintiff of the defect in his notice of claim"); *Laroc v. City of New York*, 46 A.D.3d 760, 761, 847 N.Y.S.2d 677 (2d Dep't 2007) ("Contrary to the plaintiffs' contention, the defendants were under no obligation to plead, as an affirmative defense, the plaintiffs' failure to comply with the statutory notice of claim requirement"); *Wollins v. New York City Bd. of Educ.*, 8 A.D.3d 30, 30, 777 N.Y.S.2d 637 (1st Dep't 2004) ("a municipal

authority is under no obligation to notify a plaintiff that his notice of claim is not timely").

Furthermore, defendants' amended answer did raise, in the form of an affirmative defense, plaintiff's failure to file a notice of claim pursuant to Gen. Mun. L. §§ 50–e and 50–i. Dkt. # 9 ¶ 26. Although as stated, this "defense" need not have been pleaded at all, I find that this was sufficient to put plaintiff on notice that defendants were asserting this deficiency in her HRL claim. *Cf. Hardy v. New York City Health & Hosp. Corp.,* 164 F.3d 789, 792 (2d Cir.1999) (affirming dismissal of claim against municipal defendant based on failure to meet New York's notice-of-claim requirement, and noting with apparent approval district court's finding that defendant's "answer containing the objection that the complaint did not state a cause of action was sufficient to preserve that defense").

Finally, plaintiff argues that the notice of claim requirement does not apply to her claims against Green. That argument is unpersuasive. Courts have routinely applied this requirement to claims against district attorneys and other county officials and employees. *See, e.g., Keating v. Gaffney,* 182 F.Supp.2d 278, 290 (E.D.N.Y. 2001) (dismissing HRL claims against county executive and other county employees); *Pustilnik v. Hynes,* No. 99–CV–4087, 2000 WL 914629, at *7 (E.D.N.Y. June 27, 2000) (dismissing state law employment discrimination claim on ground that district attorney and another county employee were "[c]ounty officials subject to the notice of claim provision under [§ 52]").

■ That is not to say that the application of the requirement to Green is automatic. "Service of a notice of claim upon . . . an employee of a county is not a condition precedent to the commencement of an action against such person unless the county is required to indemnify such person." *Grasso,* 30 A.D.3d at 817, 817 N.Y.S.2d 186. A county's duty to indemnify one of its officials or employees "turns on whether [that individual was] acting within the scope of [his] employment, and if that local option was formally adopted by a local governing body." *Id.* (citing N.Y. Pub. Off. L. § 18(1)(a), (b), and (4)(a)). Defendants have submitted evidence that Monroe County has enacted a law providing for indemnification of "[a]ny person holding a position by election . . . in the service of the County of Monroe," with respect to any judgment against that person resulting from an act or omission that occurred while he was acting in the scope of his employment. Dkt. # 29–4.

In the case at bar, plaintiff contends that Green is not entitled to indemnification by Monroe County, because plaintiff has alleged that he acted intentionally. Under New York law, a county's "duty to indemnify . . . shall not arise where the injury or damage resulted from intentional wrongdoing or recklessness on the part of the employee." N.Y. Pub. Off. L. § 18.

■ Under New York law, an employee's "intentional conduct may be said to have been within the scope of his employment when his employer could have reasonably anticipated the conduct." *Helbig v. City of New York,* 212 A.D.2d 506, 508, 622 N.Y.S.2d 316 (2d Dep't 1995). "[T]he employer need not have foreseen the precise act or the exact manner of the injury as long as the general type of conduct may have been reasonably expected." *Riviello v. Waldron,* 47 N.Y.2d 297, 304, 418 N.Y.S.2d 300, 391 N.E.2d 1278 (1979).

In the case at bar, Green was clearly acting within the scope of his employment when he issued his directives concerning Bielski's scheduling. Even assuming *arguendo* that Bielski's rights were violated,

that Green *acted* intentionally does not mean that he was guilty of intentional wrongdoing. The evidence before me shows that Green acted solely in his role as administrator of the DA's office, and not out of any personal motives or desire to harm plaintiff. *Cf. George v. New York City Transit Auth.*, No. 04 CV 3263, 2008 WL 4274362, at *3 (E.D.N.Y. Sept. 17, 2008) (noting that "[a]cts of workplace harassment and other intentional torts are generally not considered conduct within the scope of employment since they are often motivated by personal reasons").[6]

## CONCLUSION

Defendants' motion for summary judgment (Dkt.# 14) is granted, and the complaint is dismissed.

Plaintiff's motion for summary judgment (Dkt.# 20) is denied.

Defendants' motion for leave to amend or correct their answer (Dkt.# 29) is denied as moot.

IT IS SO ORDERED.

---

6. Though plaintiff has not requested leave to file a late notice of claim, I note that such a request would have to be denied, since "such an application must be made within one year and ninety days after the accrual of the claim." *Zhao*, 656 F.Supp.2d at 401.